UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

CAMILO K. SALAS, III,
  As Trustee of the Salas Children Trust,

     Plaintiff,

v.                            Case No. 3:21-cv-890-MCR-HTC

COMMONWEALTH LAND TITLE INS. CO.,

     Defendant.

_____/

## ORDER AND
## REPORT AND RECOMMENDATION

Plaintiff, Camilo K. Salas, III, as Trustee (the "Trustee") of the Salas Children Trust (the "Trust"), and also counsel of record for the Trust, brings this suit for breach of a title insurance policy issued by Defendant, Commonwealth Land Title Insurance Co. ("Commonwealth"), arising out of the Trust's purchase of a lot located in Alys Beach, a residential community in Walton County, Florida.

As will be discussed in further detail below, the Trustee executed a purchase agreement requiring the Trust to build on the lot within two (2) years after closing, or face certain consequences, including the ability for the developer/seller to repurchase the property and significant liquidated damages. The Trust did not build on the lot within the 2-year period, and, in 2015, the developer brought suit against the Trust for breach of the Purchase Agreement.

The Trust sought indemnification and defense from Commonwealth and Commonwealth denied coverage. After the conclusion of the Trust's litigation with the developer, the Trust brought the instant action against Commonwealth for (1) failure to provide a defense; (2) failure to indemnify; (3) abstractor contractual liability, (4) liability for transfer fee covenants; and (5) bad faith failure denial of coverage. ECF Doc. 27. The Trust seeks damages consisting of $1,780,517.62 as attorneys' fees, costs, and damages it incurred as a result of settling the litigation.

This matter was referred to the undersigned for a report and recommendation on all pending pretrial motions. Pending before the Court are the following: (1) Defendant's motion to dismiss, ECF Doc. 29; (2) Plaintiff's motion for default and to strike the motion to dismiss, ECF Doc. 33; (3) Plaintiff's motion for summary judgment, ECF Doc. 38; and (4) Defendant's motion to stay case and reset scheduling order, ECF Doc. 40. Each of the motions have been fully briefed by the parties.

Upon careful review and consideration, and for the reasons set forth below, the undersigned recommends Plaintiff's motion for default and to strike be DENIED, Defendant's motion to dismiss be treated as a motion for summary judgment and be GRANTED, and Plaintiff's motion for summary judgment be DENIED. Accordingly, Defendant's motion to stay is MOOT.

I.    **THE TRUST'S MOTION FOR DEFAULT AND TO STRIKE THE MOTION TO DISMISS AND COMMONWEALTH'S MOTION FOR A STAY OR TO SUPPLEMENT MOTION TO DISMISS**

The undersigned will first address the Trust's motion for entry of default and to strike Commonwealth's motion to dismiss. ECF Doc. 33. The Trust's motion is based on the following grounds: First, the Trust argues that by filing a motion to dismiss, rather than an answer, to the amended complaint, Commonwealth is in default. Second, the Trust argues Commonwealth's motion to dismiss should be stricken because Commonwealth failed to timely assert its affirmative defenses when it filed its answer to the original complaint. The undersigned disagrees as to both arguments. The Trustee's arguments are based on a tortuous interpretation of the civil procedural rules and are contrary to the Eleventh Circuit's disfavor of default judgments.

The Trust initially filed this suit in January 2021, in state court in Louisiana. On January 29, 2021, Commonwealth removed the matter to the United States District Court for the Middle District of Louisiana, *Salas v. Commonwealth*, C-703386. On February 2, 2021, Commonwealth filed a motion to transfer venue under 28 U.S.C.A. § 1404(a) (West). ECF Doc. 5. While that motion was pending, on February 12, 2021, Commonwealth filed an answer to the complaint. ECF Doc. 8. The Trust argues Commonwealth's answer was late because it should have been

filed on February 4, 2021, seven (7) days after Commonwealth removed the case to the Louisiana federal court.  *See* Fed. R. Civ. P. 81(c)(2)(C).

On July 12, 2021, the Louisiana federal court granted Commonwealth's motion to transfer venue.  ECF Doc. 16.  The case was transferred to this Court on July 20, 2021.  ECF Doc. 18.  In September 2021, the Trust filed a motion to amend its complaint, which the Court granted.  ECF Docs. 24, 26, 27, 28.  Rather than file an answer to the amended complaint, however, as it had done to the original complaint, on October 18, 2021, Commonwealth filed the pending motion to dismiss.  ECF Doc. 29.

As an initial matter, the undersigned finds Commonwealth did not waive its ability to assert affirmative defenses to the Trust's claims by filing a belated answer to the original complaint.  Regardless of whether that answer was late, the Louisiana federal court denied the Trust's motion for default and accepted the answer.  ECF Doc. 9.  That answer contained several affirmative defenses.  ECF Doc. 8.  The Trustee did not move to strike that answer or those affirmative defenses "within 21 days after being served with the pleading."  *See* Fed. R. Civ. P. 12(f) (setting forth deadline for filing a motion to strike from a pleading "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter").  Indeed, the Trust did not raise the untimeliness until the motion for default and to strike in the instant case.

Regardless, even if Commonwealth had waived its affirmative defenses, the Trust reopened the pleadings by filing an amended complaint. Contrary to the Trust's description of the amended complaint, it did more than make simple minor corrections to conform the original complaint to federal court pleading requirements. Unlike the amendment in *Regions Bank v. Commonwealth Land Title Ins., Co.*, 2012 WL 5410948 (S.D. Fla. Nov. 6, 2012), a case relied upon by the Trust, where the amended complaint "only changed the issuance date of a policy endorsement from 2006 to 2008,", *id.,* at *3, the Trust's amended complaint changed the scope of the case.

The original complaint was 18 pages long. The amended complaint is 43 pages long. The original complaint sought relief for breach of contract and under specific Louisiana statutes. ECF Doc. 1-1. The amended complaint seeks relief for failure to provide a defense, failure to indemnify abstractor contractual liability, liability for transfer fee covenants, and bad faith denial of coverage. ECF Doc. 27. Thus, the amended complaint reopened the pleadings. *See Krinsk v. SunTrust Banks, Inc.,* 654 F.3d 1194, 1203 (11th Cir. 2011) (finding changes in amended complaint, while complaint was still based on same operative facts as the original complaint, were not "immaterial", where they broadened the scope of the litigation).

The undersigned also finds no merit to the Trust's argument that by filing a motion to dismiss to the amended complaint, rather than an answer, Commonwealth

in in default.  The Trust's argument that a 12(b)(6) motion tolls the time for filing an answer applies *only* to the original complaint and not an amended complaint is simply not supported.

Under Rule 15(a)(3), a defendant has "14 days after service of the amended pleading," to make "*any required response*."  Fed. R. Civ. P. 15(a)(3).  A "required response" can be an answer or it can be one of the motions set forth in Rule 12(b).  A 12(b)(6) motion for failure to state a claim "must be made before pleading."  Fed. R. Civ. P. 12(b)(6).  Under Rule 12(a)(4), if a 12(b) motion is filed – the time to answer is tolled until fourteen (14) days after the court's resolution of the motion.  Fed. R. Civ. P. 12(a)(4).

Nothing in rules show that Rule 12(a)(4) was meant to apply only to original complaints.  In other words, if a 12(b) motion can be filed in response to an amended complaint, it only makes sense for the time to file an answer to an amended complaint to also be tolled pending the resolution of such a motion.  The analysis is no different just because an answer, rather than a 12(b) motion was filed in response to the original complaint, particularly where the pleadings were reopened.  *See e.g., Ello v. Brinton,* 2015 WL 7016462, at *4 (N.D. Ind. Nov. 10, 2015) (holding that the time for filing an answer to the amended complaint was tolled because defendant filed a partial motion to dismiss before the deadline for filing a responsive pleading); *Shah v. KIK Int'l LLC,* 2007 WL 1876449, at *1 (N.D. Ind. June 26, 2007) (holding

the pendency of a motion to dismiss tolls the time for filing an answer to amended counterclaims).

In support of its position, the Trustee relies on *Gen. Mills, Inc. v. Kraft Foods Glob., Inc.*, 487 F.3d 1368 (Fed. Cir.), *decision clarified on reh'g*, 495 F.3d 1378 (Fed. Cir. 2007). However, in that case the court determined a counterclaim was not pending because it had not been reasserted in response to an amended complaint, where defendant had filed only a 12(b) motion. Moreover, the court's decision in *General Mills* has been called into question. As one court stated, "[r]equiring an answer to an amended pleading when a motion to dismiss is pending 'potentially results in duplicative pleadings, confusion regarding the proper scope of discovery, unnecessary expenses, and wasted time.'" *Direct Enterprises, Inc. v. Sensient Colors LLC,* 2017 WL 2985623, at *3 (S.D. Ind. July 13, 2017).

Indeed, even when a 12(b)(6) motion to dismiss does not address every claim in a complaint, the majority of courts, including a court in this District, have found a separate answer addressing the other claims to be unnecessary because the motion to dismiss tolls the answer deadline. *See e.g, Beaulieu v. Bd. of Trs. Of Univ. of W. Fla.*, 3:07-cv-30-RV/EMT, 2007 WL 2020161, at *2 (N.D. Fla. July 9, 2007) (collecting cases and stating, "Defendant's motion to dismiss, therefore, automatically extends its time to answer under Rule 12(a)(4) until after the court has ruled on Defendant's motion to dismiss"); *Jacques v. First Liberty Ins. Corp.*, 2016

WL 3221082, at *1 (M.D. Fla. June 9, 2016) (collecting cases and denying motion for entry of default based on the filing of a partial motion to dismiss without an answer). Thus, Commonwealth's time to answer the amended complaint is stayed until after resolution of the motion to dismiss. *See Beaulieu*, 2007 WL 2020161, at *2; Fed. R. Civ. P. 12(a)(4).

Finally, it is well settled there is a "strong policy of determining cases on their merits" and, therefore, "default judgments are generally disfavored." *Gaffney v. Warden, Taylor Correctional Inst.,* 2022 WL 18381, at *2 (11th Cir. Jan. 3, 2022) (finding district court did not abuse its discretion in denying plaintiff's request for entry of default based on a belated answer) (citing *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1244–45 (11th Cir. 2015) and quoting *In re Worldwide Web Sys., Inc.*, 328 F.3d 1291, 1295 (11th Cir. 2003)). Thus, the undersigned recommends the Trust's motion for default and to strike be denied.

The undersigned will consider Commonwealth's motion to dismiss, and pursuant to its request in the motion to stay, or alternatively to accept supplement[1] to motion to dismiss, ECF Doc. 40, the Court will treat the motion as a motion for summary judgment.[2] See *City of Jacksonville, Fla. v. Mun. Elec. Auth. of Georgia,*

---

[1] The supplement was C. Salas' deposition testimony, which was also attached in Commonwealth's response to the Trust's motion for summary judgment.

[2] Based on this Report and Recommendation, Commonwealth's alternative request for a stay and resetting of the scheduling order is MOOT. Under Federal Rule of Civil Procedure 12(d), if the

2019 WL 7819483, at *2 (N.D. Ga. Dec. 19, 2019), citing Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."); *Jones v. Automobile Ins. Co. of Hartford. Conn.,* 917 F.2d 1528, 1532 (11th Cir.1990) (finding that whether to convert a motion to dismiss to a motion for summary judgment is at the court's own discretion).

## II.    CROSS MOTIONS FOR SUMMARY JUDGMENT

The undersigned will now address the pending dispositive motions.

### A.    Legal Standard

Summary Judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if, "under the applicable substantive law, it might affect the outcome of case." *Hickson Corp., v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004) (internal citations omitted). A material dispute of fact is "genuine"

---

Court treats a motion to dismiss as one for summary judgment under Rule 56, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* Here, Plaintiff was given such a reasonable opportunity as he filed a motion for summary judgment to which he attached extensive evidentiary material and which covered all the issues addressed in the motion to dismiss. *See United States v. Holt*, 76 F. Supp. 2d 1374, 1377 (M.D. Ga. 1999) ("Although neither party has expressly waived this notice requirement, the Court finds that the parties have been fairly apprised of the evidentiary bases in support and in opposition to the motion, and thus have constructively waived the notice requirement.")
.

if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of informing the court of the basis for its motion and identifying the portions of the record which support its position. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). Once the movant has met its burden, the nonmoving party is then required "to go beyond the pleadings" and identify competent record evidence which shows the existence of a genuine, material factual dispute for trial. *Id.* at 324. In doing so, and to avoid summary judgment, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that [a] jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.1990).

B.   **Statement of Material Facts**

The material facts in this case are not disputed, are taken from the Trust's motion for summary judgment, and are as follows: In 2009, the Trust purchased Courtyard Lot 7, Block NN, Alys Beach Phase 2-B, in the Town of Alys Beach, Florida (the "Lot"), from the developer, Ebsco Gulf Coast Development, Inc. ("Ebsco"), for $1,350,000.00. The Trust, through its Trustee, and Ebsco entered into

a Purchase and Sales Agreement ("Purchase Agreement"), dated July 31, 2009, for the Lot.

Commonwealth issued a Florida Owner's Title Policy to the Trust, Policy Number 2009.8110609-79534149, dated October 2, 2009, (the "Policy") covering the Trust's title to the Lot. The Policy excepted from coverage loss or damage arising from various documents identified in Schedule B of the Policy. One of those documents listed in Schedule B, is the recorded Declaration of Covenants, Conditions and Restrictions for the Neighborhood of Alys Beach ("Declaration of Covenants").

The Declaration of Covenants contained a provision requiring purchasers to build on the Lot within two (2) years of purchase the Lot. If the purchaser failed to comply with that requirement, then Section 4.3 of the Declaration of Covenants gave "Ebsco … the right, but not the obligation, to repurchase the Lot for the amount set out in the Declaration." The Warranty Deed also included a "NOTICE OF REPURCHASE OPTION," referencing that provision of the Declaration of Covenants.

The Purchase Agreement contained the same 2-year requirement and repurchase option in favor of Ebsco. *Additionally*, under the Purchase Agreement, the Trust was "obligated to pay [Ebsco], as liquidated damages, a monthly amount equal to ten percent (10%) of the Total Purchase Price divided by twelve (12) for

each month (or portion thereof if applicable) for which commence of the construction or completion of construction is delayed". According to the Trust, this came to $11,250.00 per month. The Purchase Agreement was not identified as an exception in Schedule B.

The Trust did not build on the Lot within 2 years of closing. In 2015, Ebsco filed suit against the Trust for breach of the Purchase Agreement, Declaration and Covenants, and Warranty Deed, seeking to repurchase the Lot and recover liquidated damages. *See Ebsco Gulf Coast Dev., Inc. v. Camilo K. Salas III, as Trustee of the Salas Children Trust, et al.*, 3:15-cv-586-MCR/EMT, 2018 WL 7288764 (N.D. Fla. Aug. 1, 2018 (removed to this Court from the First Judicial Circuit Court for Walton County, Florida, Case No. 15-CA-571) (the "Ebsco Litigation").

Subsequently, the Trust sought defense and indemnification from Commonwealth for the Ebsco Litigation. On January 7, 2016, Commonwealth denied coverage. After almost three (3) years of litigation, the Trust settled the Ebsco Litigation in August 31, 2018. The settlement included the Ebsco repurchasing the Lot for a significantly reduced price. Additionally, the Trust incurred $846,430.12 in defending the Ebsco Litigation.

## C.    Choice of Law

Both parties spend considerable time in their papers arguing about which state's substantive law, Florida or Louisiana, applies. Yet, both parties also concede

that regardless of whether Florida or Louisiana's substantive law applies, the result would be the same as there is no conflict between these state's substantive laws. Thus, it would seem a choice of law analysis would be purely academic.  *See Fioretti v. Mass. Gen. Life Ins. Co.,* 53 F.3d 1228, 1234 (11th Cir. 1995) (noting that a choice of law analysis is unnecessary where the applicable laws of the states at issue do not conflict).   Nonetheless, for sake of completeness, the undersigned provides the following analysis.

The starting point for the Court's choice of law analysis is to determine which state's choice of law rules apply.  *See Ellis v. Greath Southwestern Corp.*, 64 F.2d 1099, 1107 (5th Cir. 1981) ("If the case has been transferred from a district court in one state to a district court in another state, the transferee court must first decide which state's choice of law rules it should apply.").   In its motion to dismiss, Commonwealth assumes the transferee court, Florida's, choice of law rules would apply.  The Trust, however, argues this Court should apply Louisiana's choice of law rules because "the law of the transferor forum continues to apply" after the case is transferred.  ECF Doc. 32 at 13.  As Commonwealth later conceded in its response to the Trust's motion for summary judgment, the Trust is correct – Louisiana's choice of law rules apply.

When a transfer of venue is based on *forum non conveniens* grounds under § 1404(a), the choice of law provisions of the transferor state applies.  In *Van Dusen*

*v. Barrack*, 376 U.S. 612 (1964), the Court held that when a case that had properly been filed in one district court was transferred under section 1404(a) at the motion of the defendant to another district court in a different state, the transferee court was bound to apply the law that would have been applied by the state courts of the state in which the transferor court sat.  *See Ellis*, 64 F.2d at 1107 (citing *Van Dusen*, 376 U.S. at 638-39).

Commonwealth also concedes in its response to the Trust's motion for summary judgment that Louisiana courts (unlike Florida courts) apply the Second Restatement's "most significant relationship" test for determining which state's law applies.[3]  *Gates v. Claret,* 945 F.2d 102, 103 (5th Cir.1991), *see* Restatement (Second) of Conflict of Laws § 6 (1971) comment (b), and § 188 (1971).  Under the "most significant relationship" test, courts consider the following contacts:

    (a) place of contracting
    (b) place of negotiating the contract
    (c) the place of performance
    (d) the domicile, residence, nationality, place of incorporation and place
       of business of the parties.

---

[3] Louisiana actually employs a 2-step "interest analysis," the second step of which is the application of the most significant relationship test.  *See Dugger v. Upledger Inst.*, 795 F. Supp. 184, 187 (E. D. La. 1992); *In re Combustion*, 960 F.Supp. 1056, 1066-67 (W.D. La. 1997).  Under the first step of the interest analysis, the Court must determine "whether a true or false conflict exists between the interested states.  If only one state has an interest then a false conflict exists, and the law of the solely interested jurisdiction controls."  *See Gates v, Claret*, 945 F.2d 102, 103 (5th Cir.1991).

These contacts are to be evaluated according to their relative importance with respect to the particular issue. *See* Restatement (Second) of Conflict of Laws § 188 (1971); *In re Combustion, Inc.*, 960 F. Supp. 1056, 1067 (W.D. La. 1997). Also, when dealing with an insurance policy, the courts in Louisiana have "balanced the interests of Louisiana and the state of the insurance contract to determine which state had more significant interests in the matter." *Baker v. Lazarus,* 1992 WL 111188, *5 (E.D.La.1992).

Under the most significant relationships test, the undersigned agrees with Commonwealth that Florida substantive law applies. Florida has more significant interests in this matter.

First, the insured property, the Lot, is located in Florida. The location of the Lot, while not dispositive, is certainly an important factor. As the *Restatement (Second) of Conflicts of Laws* § 188 comment (e) notes:

> When the contract deals with a specific physical thing, such as land ... the state where the thing or the risk is located will have a natural interest in transactions affecting it. Also, the parties will regard the location of the thing ... as important. Indeed, when the thing ... is the principal subject of the contract, it can often be assumed that the parties, to the extent that they thought about the matter at all, would expect that the local law of the state where the thing ... was located would be applied to determine many of the issues arising under the contract.

*See also Bailey v. Shell W. E&P, Inc.,* 609 F.3d 710, 725 (5th Cir. 2010) (citing comment (e)); *Restatement (Second) of Conflict of Laws*, § 193.[4]

Second, the Policy is a Florida owner's title policy, issued by an agent located in Florida, who signed the Policy in Florida, and accepted the Trust's offer to purchase coverage in Florida.  Third, the Trust's breach of the Purchase Agreement, resulting in the demand for coverage, occurred in Florida, when the Trust failed to construct on the Lot.

Indeed, other than the Trust being located in Louisiana and thus the Policy being sent there, Louisiana has minimal interest in this action.  The undersigned, therefore, finds that under Louisiana's choice of law rules, Florida's substantive law applies to the issues in this case.  *See Kirwan v. Chicago Title Ins. Co*, 612 N.W.2d 515, 522 (2000), *aff'd in part, rev'd in part,* 624 N.W.2d 644 (2001) (applying § 188 to title insurance mater and applying South Dakota law because the contracts for the land sale and the title insurance were made in South Dakota, the title commitment and title insurance policy were issued by Chicago Title's agent, in South Dakota, and "Nebraska has little to do with the title insurance contract, except that the Kirwans

---

[4] *Restatement (Second) of Conflict of Laws,* § 193, provides as follows:

> The validity of a contract of [casualty insurance] and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship ... to the transaction and the parties, in which event the local law of the other state will be applied

are residents of Nebraska and that Chicago Title delivered the title insurance policy to the Kirwans in Holt County, Nebraska").

### D.    Florida Law

Under Florida law, an insurer's duty to defend its insured against a legal action arises when the complaint against the insured alleges facts that fairly and potentially bring the suit within policy coverage. *See Jones v. Fla. Ins. Guar. Ass'n*, 908 So.2d 435, 442-43 (Fla. 2005). The Court must look "solely on the facts and legal theories alleged in the pleadings and claims" by Ebsco against the Trust. *See Nat'l Union Fire Ins. Co. v. Lenox Liquors, Inc*., 358 So. 2d 533, 536 (Fla. 1977), *opinion adopted sub nom. Nat. Union Fire Ins. Co. v. Lenox Liquors*, 360 So. 2d 122 (Fla. Dist. Ct. App. 1978).

Also, under Florida law, an insurance policy is a "contract and is construed according to its plain meaning. Ambiguities are construed against the insurer and in favor of coverage." *Shaw v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* 605 F.3d 1250, 1252 (11th Cir. 2010), *citing Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.,* 913 So.2d 528, 532 (Fla.2005). "[A] policy provision is ambiguous only if 'susceptible to more than one reasonable interpretation, one providing coverage and . . . another limiting coverage.'" *See Shaw,* 605 F.3d at 1252 (quoting *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000)). Such an ambiguity, however, "does not exist merely because a contract can possibly be interpreted in more than

one manner." *Shipner v. Eastern Air Lines, Inc.,* 868 F.2d 401, 409 (11th Cir.1989) (applying Florida law) (citing *Am. Med. Int'l, Inc. v. Scheller*, 462 So. 2d 1, 7 (Fla. Dist. Ct. App. 1984), *cert. denied,* 474 U.S. 947 (1985)).

"[I]n construing insurance policies, courts should read each policy as a whole, endeavoring to give every provision its full meaning and operative effect." *Shaw,* 605 F.3d at 1252. Also, "[c]ontracts of insurance should 'receive a practical, reasonable, and fair construction consonant with the apparent object and intent of the parties' viewed in light of their purpose.'" *Laws. Title Ins. Corp.*, 52 F.3d at 1583 (citing 43 Am. Jur. 2d Insurance § 276).

## E.   The Title Policy

The Policy contains the following pertinent insuring provision:

> SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B, AND THE CONDITIONS AND STIPULATIONS, COMMONWEALTH LAND TITLE INSURANCE COMPANY … insures … against loss or damage … sustained or incurred by the insured by reason of:
>
> 1.   Title to the estate or interest described in Schedule A being vested on then as stated therein;
> 2.   Any defect in or lien or encumbrance on the title;
> 3.   Unmarketability of the title;
> 4.   Lack of right of access to and from the land.
>
> The Company will also pay the costs, attorneys' fees and expenses incurred in defense of the title, as insured, but only to the extent provided in the Conditions and Stipulations.

ECF Doc. 29-1.

Schedule B excepts from coverage several items, including the "Restrictions, covenants, conditions and easements" covering the Property. *Id.* 29-1 at 3, Schedule B., exclusion 2. As the Trust points out, Schedule B does not except the Purchase Agreement. Thus, the Trust argues, absent such an exception and in light of the agent's knowledge of the Purchase Agreement, the Policy provides coverage for the Ebsco Litigation.

While the Trust is correct that, generally, a title insurer's failure to identify an encumbrance or defect on title as an exception to coverage precludes the insurer from denying coverage for that encumbrance or defect, *see e.g., Parker v.* Ward, 614 So. 2d 975, 977 (Ala. 1992), that general rule is not without exception. As the Florida Appellate Court stated in *Laws. Title Ins. Corp. v. D.S.C. of Newark Enterprises, Inc.*, 544 So. 2d 1070 (Fla. Dist. Ct. App. 1989), a case relied upon by the Trust, "the courts have been loath[] to impose liability on a title insurer for a condition of which the insured had actual, express knowledge." *Id.* at 1073 .

That exception furthers the purpose of title insurance, which is to protect a purchaser of real estate against title surprises. *See Nourachi v. First Am. Title Ins. Co.,* 44 So.3d 602, 606 (Fla. Dist. Ct. App. 2010); *Commonwealth Land Title Ins. Co. v. Ozark Glob., L.C.,* 956 F. Supp. 989, 991–92 (S.D. Ala.), *aff'd sub nom. Commonwealth Land v. Ozark Glob.,* 127 F.3d 41 (11th Cir. 1997 (explaining purpose of title insurance), *citing Pohrer v. Title Ins. Co. of Minnesota,* 652 F. Supp.

348, 352 (N.D. Ill.), *vacated*, 882 F. Supp. 114 (N.D. Ill. 1987).  "A prospective purchaser of real estate relies on the title insurer's [public records] search when they decide whether or not to purchase the property.  Thus, they expect the insurer to have (1) researched the applicable law, as well as the records, before issuing the commitment and (2) to provide warnings about areas in which they might find surprises."  *Id., citing Pohrer*, 652 F. Supp. at 353 (emphasis remoed).

The Purchase Agreement, however, was not a surprise to the Trust, nor were the Trust's obligations under the Purchase Agreement.  *See Commonwealth Land Title Ins., Co.*, 956 F. Supp. at 992 ("When, as in this case, the insured has knowingly purchased land encumbered by tax liens, it cannot be said that the insured will experience 'surprise' when the title insurance policy does not list a known encumbrance as an exception to coverage").

Nonetheless, the Trust argues Commonwealth's failure to except the Purchase Agreement is dispositive because Commonwealth's agent knew about the liquidated damages provision in the Purchase Agreement and agreed to provide coverage for that risk.  The Trust, however, has provided no evidence to support such an agreement.  Thus, the Trust's reliance on case such as *Bozeman v. Commonwealth Land Title Ins. Co.*, 470 So. 2d 465 (La. Ct. App.), *writ denied sub nom. Bozeman v. Com. Land Title Ins. Co.,* 475 So. 2d 359 (La. 1985), is misplaced.

In *Bozeman,* the insured presented evidence from Commonwealth's agent showing that "not only would Commonwealth write a $300,000.00 policy insuring over the servitude for Bozeman and Valluzzo, but also Commonwealth would insure the title without exception for a future purchaser from Bozeman and Valluzzo, at no cost to either purchaser or seller." *Id.* at 466. Regardless of whether the agent knew about the Purchase Agreement, unlike *Bozeman*, there is no evidence here Commonwealth "agreed to insure 'over'" the risks identified in the Purchase Agreement.

Moreover, Commonwealth argues there was no need for the Purchase Agreement to be identified in Schedule B, because the Purchase Agreement was an obligation agreed to by the Trust, and thus, excluded under Standard Exclusion 3(a). The burden of proving an exclusion to coverage is on the insurer. *See LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1516 (11th Cir. 1997). As discussed in the next section, the undersigned finds Commonwealth has met that burden.

### F.    Standard Exclusion 3(a)

Standard Exclusion 3(a) excludes from coverage "Defects, liens, encumbrances, adverse claims or other matters created, suffered, assumed or agreed to by the insured claimant." *See* Policy, Exclusion 3(a), ECF Doc. 29-1 at 1. This exclusion is "one of the most litigated clauses in a standard title insurance policy." Palomar, TITLE INS. LAW § 6.10 (2021 ed.)*; see also BB Syndication Servs., Inc. v.*

*First Am. Title Ins. Co.*, 780 F.3d 825, 826 (7th Cir. 2015); George L. Blum, *Title Insurance: Exclusion of Liability for Defects, Liens, or Encumbrances Created, Suffered, Assumed, or Agreed to by Insured,* 27 A.L.R.7th Art. 6 (Originally published in 2017).

Standard Exclusion 3(a) has been described as excluding matters that are the insured's "own darn fault." TITLE INS. LAW § 6.10 (citing *Captiva Lake Investments, LLC v. Fidelity Nat'l Title Ins. Co.,* 883 F.3d 1038, 1047 (8th Cir. 2018) (applying Exclusion 3(a) to mechanics' liens that arise because of insufficient funds when a lender cuts of funding for a construction project because of a developer's default of a construction loan agreement); *BB Syndication Servcs., Inc.*, 780 F.3d at 826 ("standard exclusion for liens 'created, suffered, assumed or agreed to' by the insured lender" applied to liens "which resulted from the lender's cutoff of loan funds . . . . [T]hus the title insurer owes no duty to indemnify"); *Mattson v. St. Paul Title Co. of the South*, 277 Ark. 290, 641 S.W.2d 16, 18 (1982) ("This type of exclusionary provision, commonly found in title insurance policies, has been construed to insulate the insurer from liability where the loss incurred by the insured results from the insured's own intentional, illegal, or inequitable conduct.")).

The courts are divided on whether Exclusion 3(a) is ambiguous. As the Trust argues, some courts have found the provision to be ambiguous. *See e.g., Chicago Title Ins. Co. v. Resolution Trust Corp.,* 53 F. 3d 899 (8th Cir. 1995). The

undersigned is unable, however, to find any discussion by those courts about why the exclusion either is or is not ambiguous. In *Chicago Title Ins. Co.,* for example, the Eighth Circuit simply stated "[t]he language in exclusion 3(a) is ambiguous, as evidenced by the Sixth Circuit's attempt to define each word by extra-policy definitions." *See Chicago Title Ins. Co.*, 53 F.3d at 907. The Sixth Circuit case relied upon by the court in *Chicago Title Ins. Co.*, is *Am. Sav. & Loan Ass'n v. Laws. Title Ins. Corp.,* 793 F.2d 780, 784 (6th Cir. 1986)*,* which relied on the Eighth Circuit's decision in *Brown v. St. Paul Title Ins. Co.*, 634 F.2d 1103 (8th Cir. 1980). The Eighth Circuit, however, did not explicitly decide that the exclusion was ambiguous.

To the contrary, the undersigned finds nothing ambiguous about the exclusion or any reason why the exclusion cannot be interpreted based on its plain meaning.[5] As the Arizona Supreme Court explained:

> Considering the nature of title insurance, we conclude that the exclusion is not ambiguous and that it applies whenever the insured intended the act causing the defect, not only when the insured intended the defect or when the insured engaged in misconduct. *Title insurance principally protects against unknown and unknowable risks caused by third-party conduct, not intentional acts of the policyholder.* Otherwise, the insured would be able to use title insurance to make windfall profits.

---

[5] Indeed, those courts superimpose an equitable or intentional misconduct element to the exclusion, which simply does not exist.

*First Am. Title Ins. Co. v. Action Acquisitions, LLC,* 187 P.3d 1107, 1113 (Ariz. 2008) (emphasis added).

The exclusion applies to two primary factual situations. *See* Palomar, TITLE INS. LAW § 6.12 (2021). The first is "when language in the insured's purchase or mortgage contract suggests the insured took title 'subject to' a specific lien, encumbrance, or other title defect" and the second, is when "the insured failed to perform some act assumed or agreed to in a legal contract, often the purchase or mortgage contract".[6] *Id.* While the first situation does not apply here, the second does.

There is no dispute that the Trust failed to build a home on the Lot within 2 years. There is also no dispute that the Trust agreed to build a home on the Lot within 2 years or face certain penalties when it entered into the Purchase Agreement with the Ebsco. The undersigned agrees with Commonwealth that this is a textbook case for the application of Exclusion 3(a). Finding coverage here would put the

─────────────────

[6] Most of the cases falling into this second factual scenario involve a mechanics' lien filed against the property when a lender, finding the developer in default, declines to continue funding the project for work completed. The undersigned finds persuasive the underlying analysis employed by those courts finding such liens excluded from coverage. As the Seventh Circuit aptly explained, "[the insured] now looks to First American to cushion its losses, but this stretches title insurance too far. Finding coverage in this situation—where the insured lender has the sole discretion to either continue or cease funding a project that is or has become unfinishable—would raise a serious question of moral hazard." *BB Syndication Servs., Inc.*, 780 F.3d at 835; *see also, Moser v. Fid. Nat'l Title Ins. Co.,* 2018 WL 1413346, at *5-6 (E.D. Tex. Mar. 21, 2018) (finding insured's interpretation of exclusion to be unreasonable because it would "make a title insurer the guarantor of an insured's debt, where, as here, an insured who intentionally refuses to fulfill the insured's financial obligations later denies knowing that a lien would arise as a consequence").

insurer "in the unenviable position of insuring against events over which the insured had responsibility and control." *Am. Sav. & Loan Ass'n*, 793 F.2d at 786; *Home Fed. Sav. Bank v. Ticor Title Ins. Co*., 695 F.3d 725, 732 (7th Cir. 2012) (collecting cases); *see First American Title Ins. Co.*, 187 P.3d at 1113 ("Title insurance principally protects against unknown and unknowable risks caused by third-party conduct, not intentional acts of the policyholder.").

The Trust's interpretation of the Policy turns the purpose of title coverage on its head. It essentially seeks to have Commonwealth insure the Trust against consequences of its own acts and based on liability agreed to by the Trust. This, however, is not "the type of risk that title insurance is built to bear." *BB Syndication Servs., Inc.*, 780 F.3d at 833. The Trust argues the exclusion is ambiguous and thus the Court should look at the parties' negotiations to determine the intent of the exclusion. However, even were the Court to agree, the result would be no different.

First, Commonwealth focuses on the "agreed to" language in the exclusion and argues the Trust agreed to the terms of the Purchase Agreement. As defined by the Sixth Circuit, "'agreed to' carries connotations of 'contracted,' requiring full knowledge by the insured of the extent and amount of the claim against the insured's title." *Am. Sav. & Loan Ass'n,* 793 F.2d at 784. The Trust cannot escape the fact that it had knowledge of the Purchase Agreement and contracted with Ebsco to build on the Lot within the 2-year period or be subject to certain penalties. The Trustee

admitted he read the contract, agreed to the contract, and is bound by the terms of the contract.  *See* C. Salas Depo., Exh. 1 to ECF Doc. 46.

Second, "[t]he term 'created' has generally been construed to require a conscious, deliberate and sometimes affirmative act intended to bring about the conflicting claim, in contrast to mere inadvertence or negligence." *Am. Sav. & Loan Ass'n*, 793 F.2d at 784.  Here, had the Trust chosen to comply with its obligations, no coverage issues would have been implicated.  In other words, no defect or encumbrance was created on the title until the Trust failed to construct within the 2-year period *and* failed to pay the liquidated damages.  As this Court previously determined. a title issue was created when Ebsco exercised its repurchase option. *EBSCO Gulf Coast Dev., Inc.*, No. 3:15-CV-586/MCR/EMT, 2018 WL 7288764, at *10.

Third, the undersigned finds no merit to the Trust's position that Commonwealth cannot take advantage of the exclusion because its agent knew about the Purchase Agreement and failed to except it from coverage in the Title Commitment or Title Policy[7].  As stated above, the cases relied upon by the Trust are inapposite.  Regardless of whether the agent knew about the Purchase

---

[7] Commonwealth objects to the Trust's reliance on the deposition testimony of the agent, Lori Ogles, because it was taken in the Ebsco Litigation, and not this litigation.  The undersigned does not find it necessary to address that argument because the undersigned consideration of that evidence does not alter results of this case.  The same is true for Commonwealth's objection to the Trust's reliance on the Underwriting Deskbook as creating an obligation on Commonwealth to except defects and encumbrances from coverage.

Agreement, there is no evidence the agent agreed to insure over it. *See Bozeman*, 470 So. 2d at 57.

The situation here is also different from the facts in *Lawyers Title Ins. Co.*, 544 So. 2d at 1070*,* where the insurer failed to except a defect it learned through its search of the public records simply because the insured should have also known about it. Unlike the facts of this case, there was no evidence in *Lawyers Title Ins. Co.,* that the insured agreed to or created the defect. Under the facts of this case, to accept the Trust's argument the Court would have to give no effect to the exclusion, which it cannot do. *See e.g., Union Am. Ins. Co. v. Maynard,* 752 So.2d 1266, 1268 (Fla. 4th DCA 2000) (insurance policy exclusions, however, must be read in conjunction with other policy provisions).

Finally, the Trust argues it did not create any encumbrance or defect on the title, but it was Commonwealth's agent who did so by recording a Memorandum of Agreement (which summarized the Purchase Agreement). That argument, however, is contorted. As the Trust concedes, the Declaration of Covenants and Warranty Deed contain the same 2-year construction requirement and repurchase penalty as the Purchase Agreement. There is no dispute both those documents were recorded. Regardless, whether the Purchase Agreement was recorded or not would not have prevented the Ebsco Litigation. Thus, it is irrelevant that the agent recorded the Memorandum of Agreement.

In short, the Title Policy did not insure the Trust against the consequences of its own acts, did not provide coverage for loss occasioned by the Trust's breach of the terms of the Purchase Agreement, and Commonwealth was not obligated to defend or indemnify the Trust for the Ebsco Litigation, which was based solely on that breach. *See City of E. Providence v. First Am. Title Ins. Co.,* 2011 WL 5521246, at *9 (D.R.I. Oct. 13, 2011), *report and recommendation adopted,* 2011 WL 5527604 (D.R.I. Nov. 14, 2011) (applying Exclusion 3(a), and stating, "any problem in the City's title to the Property stems not from a defect in the title as it existed on September 29, 2003, when the Policies were issued, but rather from a dispute between the City and GeoNova regarding the subsequent performance of their mutual obligations under the Development and Financing Agreement and other documents.").

## III.    CONCLUSION

For the reasons set forth above, the undersigned recommends judgment be entered in favor of Commonwealth on all five causes of action in the amended complaint, ECF Doc. 27.  Because Commonwealth, for the reasons given above, was not required to provide a defense (count one) or indemnify the Trust (count two), judgment in favor of Commonwealth on counts one and two is appropriate.  Also, because the undersigned finds the Policy did not provide coverage over the Trustee's failure to honor the two-year build requirement, the Trust's claims for abstractor

liability (count three), liability for transfer fee covenants (count four), and bad faith failure to provide coverage (count five) necessarily fail. Each of these claims are premised on coverage of Trustee's breach of the two-year build requirement, which the undersigned has determined was excluded by exclusion 3(a) and did not need to be listed as an exception.

That is, the abstractor liability claim is based on Commonwealth's alleged breach of its contractual obligation to disclose the encumbrances on the title to the Lot crated by the Purchase Agreement. ECF Doc. 27 at ¶ 85. Similarly, the Trust's claim for reimbursement of the transfer free covenants is premised on the fact that the Trust had to pay a transfer fee when it sold the Lot back to Ebsco in settlement of the Ebsco Litigation. Finally, as Commonwealth points out, there is no bad faith denial of coverage claim in Florida until a determination is made that there was coverage. *See e.g., Vest v. Travelers Ins. Co.,* 753 So. 2d 1270, 75-76 (Fla. 2000).

Accordingly, it is ORDERED:

1.     Commonwealth's motion to stay and reset scheduling order or to allow Commonwealth to file a supplement to its motion to dismiss, ECF Doc. 40, is GRANTED to the extent the Court will accept the supplement and will treat Commonwealth's motion to dismiss as a motion for summary judgment.

2.     The request for a stay in ECF Doc. 40 is also DENIED AS MOOT.

It is also RESPECTFULLY RECOMMENDED that:

1.    The Trust's motion for entry of default and to strike Commonwealth's motion to dismiss (ECF Doc. 33) be DENIED.

2.    Commonwealth's motion to dismiss, ECF Doc. 29, be treated as a motion for summary judgment, and be GRANTED.

3.    The Trust's motion for summary judgment, ECF Doc. 38, be DENIED.

4.    The clerk be directed to enter judgment in favor of the Defendant, Commonwealth on all Plaintiff's causes of action.

5.    The clerk be directed to close this file.

DONE AND ORDERED this 5th day of April 2022.

/s/ Hope Thai Cannon
**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**

<u>NOTICE TO THE PARTIES</u>

Objections to these proposed findings and recommendations must be filed **within fourteen (14) days** of the date of the Report and Recommendation. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.</u> An objecting party must serve a copy of its objections upon all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.